CAROLINE M. NANCREDE

*v.*

CHARLES H. VOORHIS.

1. A bill in equity will not lie against an attorney for damages for negligence in investigating a title, but otherwise if such attorney becomes a trustee to invest.

2. The evidence showing that the attorney, in this case, promised the complainant to obtain first mortgages for her, he was held (it being a case of mingled trust and agency) accountable for the amount of the encumbrances on the property prior to hers, but not for any subsequent depreciation in the value, caused by general business depression, the property at the time of loaning being shown to have been, apart from the prior encumbrances, abundant security.

---

Bill for relief. On final hearing on pleadings and proofs.

*Mr. R. W. Parker*, for complainant.

*Mr. J. Linn*, for defendant.

THE CHANCELLOR.

The bill is filed for discovery, and a decree that the defendant account to the complainant for, and pay over to

Nancrede *v.* Voorhis.

her, $13,250 (with interest), received by him for her, to be invested for her, and which it is alleged he fraudulently invested on insufficient security of mortgage of real estate, on her conveying to him the mortgaged property, of which, through foreclosure proceedings on her mortgage, she has become the owner, subject to the prior encumbrances and taxes &c., and accounting for the rents, issues and profits, since she has had possession; or that he may be decreed to make good her loss.

In June, 1871, the defendant, who is, and then was, an attorney and counsellor at law of this state, and as such had done some legal business for the complainant, who was a widow, had in his hands $13,250 of her money, placed there by her. Part of it he had collected for her and the rest she sent to him. She was desirous of investing it securely. He proposed to her the bonds or certificates of indebtedness of the Hackensack Improvement Commission, which, after consideration, she declined. He then, as he says, proposed to her to invest the money on mortgage of certain real property, three adjoining houses and lots in Bayonne, respectively known in the cause as Nos. 7, 8 and 9, Bay View Place. The mortgages were, she says, to be the first encumbrance on the property, and a safe and undoubted security. He, on the other hand, alleges that what he said to her was that the properties were good security for $5,000 apiece, and he says his proposition to her was to invest $5,000 on each of two of the properties (Nos. 8 and 9), and $3,250 on the other (No. 7). When asked whether he told her that the mortgages were to be the first encumbrances, he answered in the negative, but qualified the answer by adding that "his recollection was, that she was clearly given to understand that she should have $5,000 on the corner house (No. 9), $5,000 on the next (No. 8), and $3,250 on the other house." When the mortgages were taken and the money loaned (which was on or about July 1st, 1871), there were prior mortgage encumbrances on the property, as follows: On the corner lot (No. 9), two mortgages for

$2,000 each and interest; on the next (No. 8), two mort-
gages for $2,000 each and interest, and on the other (No. 7),
two mortgages, one for $1,000 and interest, and the other
for $3,000 and interest.

The defendant admits that the complainant's mortgages
were to be the first encumbrances on the corner lot (No. 9),
and the lot adjoining (No. 8), and he insists that her mort-
gage on the other lot (No. 7), was to be subject to a prior
encumbrance of the $1,000 mortgage, and that the com-
plainant so understood the matter. He caused the prior
mortgages on the several lots, except one for $1,000 on No.
7, and one for $2,000 on No. 9, to be cancelled of record,
one of them October 11th, 1871, two others in 1873, and
the other in 1874, but the mortgages for $1,000 and $2,000
respectively, on Nos. 7 and 9, were never cancelled or satis-
fied, and still remain upon the property.

The interest on the complainant's mortgages was paid up
to April 1st, 1876. Under foreclosure of her mortgages, the
mortgaged premises were bought in for the complainant, in
January, 1878, at $2,000 each for Nos. 9 and 7, and $3,000 for
No. 8. The property was subject to a considerable amount
of unpaid taxes and assessments, all of which accrued, how-
ever, after the giving of the complainant's mortgages.
Since the purchase, the complainant has had possession of
the property.

The defendant admits his liability to account to the com-
plainant for the $2,000 mortgage, and by his answer prays
that an account may be had in respect thereto, and tenders
himself ready to pay the amount of that mortgage and
interest, after deducting the money due him, as he claims,
from the complainant, for professional services and dis-
bursements for her. A bill in equity will not lie against an
attorney for damages for negligence in investigating a title.
There is an adequate remedy at law. But if an attorney
becomes a mere trustee to invest, he may be held responsi-
ble in equity for negligence. *Weeks on Attorneys § 296;
British Mut. Inv. Co.* v. *Cobbold, L. R. (19 Eq.) 627; Craig* v.
*Watson, 8 Beav. 427*.

Nancrede *v.* Voorhis.

The case in hand is not one of mere negligence, but, like that last cited, is to be regarded as one of combined agency and trust. The complainant placed her money in the hands of the defendant, to be invested by him for her, on his assurance that he would invest it securely. He proposed the particular security himself to her. She knew nothing about it, except from his statements and representations, and confided entirely in him and them, and relied on his fidelity to the trust he had assumed. Of this there can be no question. He represented that the security was undoubtedly good. He denies that he represented that the mortgages were to be the first encumbrance, but says that what he said was, that the properties were good security for $5,000 each. He admits that this statement was as to Nos. 8 and 9, on each of which he proposed to invest that sum, equivalent to an undertaking that the complainant's mortgages thereon should be the first encumbrance, but not as to No. 7, on which he proposed to invest only $3,250 for her. He does not, by his answer, or in his testimony, claim that she understood that her mortgages on that property, or on any of the mortgaged premises, were not to be the first encumbrance. She swears to representations made to her by him, that her mortgages were the first encumbrance. Her sister testifies to a representation to the effect, as far as she can remember, that the searches had been made and everything was satisfactory, and that the property was worth either twice or three times as much as the mortgage.

Under the evidence it is just to conclude that the complainant understood, and had reason to understand, that she was to receive first mortgages for her security. She was not informed that it was proposed to give her a second mortgage for any part of it. The defendant is bound to account to her for the amount of the $1,000 mortgage and interest, as well as for that of the $2,000 mortgage and interest, so far as necessary to indemnify her as to Nos. 7 and 9, respectively. But otherwise he is not liable to respond to her in the transaction. The title to the property was good and

clear, except as to the encumbrances of prior mortgages. All of these mortgages, except those on No. 7, he caused to be cancelled of record, however. The property at the time of the loans was, if clear of encumbrance, abundant security for the loans.

The land (nine plots, including these three), cost the mortgagor, in May, 1870, $11,961.64. The buildings cost from $6,400 to $6,800 apiece, without taking into account the time given to the building of them by Isbills, the mortgagor, who was a builder. Including that, he says they cost: the corner one (No. 9), $9,400 ; No. 8, $8,800, and No. 7, $8,700. The cost of the whole property, then, was about $27,000. The obligor in the bonds given to the complainant was a man of ample pecuniary responsibility then. He considered himself worth $100,000. The property was sold, about the time of the making of the loan, to Randall, who was of abundant pecuniary responsibility (he considered himself worth $200,000), subject to the complainant's mortgages and the mortgage for $1,000, all of which he assumed, and he says he considered $7,500 apiece a fair cash valuation for them, if sold altogether, after he had made an expenditure of $1,000 apiece upon them in alterations or completion. They were, at that estimate, worth then, when the loan was made, $19,500, if the $1,000 apiece spent on them be regarded as spent in completing them, and not, as Isbills, the builder, says it was, in alterations. Randall says they rented, in the fall of 1871, for $675, and that a full, fair rent for them then was from $675 to $700 a year apiece. Indeed, the bill substantially admits that the property was worth $21,000, and rented for about $700 a year each property, when the loan was made. It appears that the sale to Randall was in contemplation and under negotiation when the loan was made, and was effected before the mortgages were given, and, further, that within a few months afterward the property was put in a condition which made its cash value $22,500. That it has fallen in value is not attributable to the defendant, but to the depression of

the times.   He seems to have acted in good faith in making
the investment, so far as the value of the property was con-
cerned, and not to be chargeable with negligence in that
respect.   He does not appear to have loaned more than two-
thirds of the value, and the houses were quite new.   Nor is
he responsible for the taxes and assessments.   He does not
appear to have been expressly charged, nor to have been
chargeable, with any duty in respect. to the payment of
them.   Indeed, he seems never to have undertaken to do
anything more for the complainant than invest the money,
and, though he collected her interest for her, he seems to
have done it without compensation.   In making the invest-
ment, he declined payment from her for his services, on the
ground that he would get it from the borrower.   He was
never put in funds by the complainant to pay taxes or
assessments.   She says that, in July, 1874, when the mort-
gages became due, he wrote to her asking her for instruc-
tions as to whether he should continue the investment, " as
it was such a good thing," and she replied, directing him to
continue it for three years longer.   She does not produce
that letter.   She says it is lost.   It does not appear that
there was any bad faith in the defendant's action or expres-
sion of opinion in this matter.   The interest was paid
promptly on the mortgages up to April 1st, 1876.   There
is no evidence of any undertaking, on his part, to act as the
complainant's agent after the investment was made.   The
complainant seems to have regarded his subsequent action,
in collecting and sending to her the interest, as gratuitous.
She appears to have kept the mortgages in her own posses-
sion.   He says that, after they were taken, they were deliv-
ered to her and not kept by him.   She says that, just after
they were given, he offered them to her, but retained them
at her request, and that she got them from him subse-
quently, in 1874 or 1875, and adds that she does not remem-
ber the exact date.   She sent them to him for foreclosure,
in December, 1876.

The defendant is liable only as to Nos. 7 and 9, and his liability as to those plots cannot justly be extended beyond the amount of the prior mortgages and the interest thereon. The market value of these plots will be ascertained, and an account of the money due on the mortgages on these plots will be taken, and, also, of the net rents and profits received therefrom since the complainant has taken possession thereof. No deduction is to be made in the account, whether of the market value or rents and profits, for taxes or assessments which were upon the property when the sheriff's sale took place.

The defendant will be required to pay the deficiency which may exist after deducting from the amount due on the mortgages, including any costs of foreclosure paid by the complainant, the market value of the property and the rents and profits chargeable against the complainant, and he will be required to pay the costs of this suit.